, and MSPA Claims 1, LLC v. Liberty Mutual Fire Insurance Company, and MSPA Claims 1, LLC v. Liberty Mutual Fire Insurance Company. Take your time and set up. Let me go ahead and call the cases. These are cases consolidated for oral argument. The first one is where one of them is MSP Recovery Claims, Series LLC v. Ace American Insurance and the cases in tandem are 18-12139, 18-12149, 18-13049, and 18-13312. Who's going first? Mr. Zincon? Whenever you're ready. And let me see if I've got everything right. So you're splitting your time 13 and 7, right? That's correct. And I have with me here my colleagues from Rivero Mestre who represent MSP Acclaims 1 in the particular liberty matter. They are, for the time being, going to provide you moral support. Correct. Not reserve any time in the event that the court asks questions. However, Mr. Rolnick is available to answer those. Thank you very much. And then on the other side, Ms. Copperwaithe, you've got seven minutes. And then Ms. McAllister, you've got three. And Mr. Friedman, you've got seven. And Mr. Russo, you've got three. Okay, we're set to go. Fire away. Good morning. Francesco Zinconi of Armas Bertrand Pieri here on behalf of the appellant MSP Recovery Claims Series, LLC. May it please the court. If you could, before you start, just at least for me, give me a road map as to the order in which you're going to address the various issues. Your Honor, a number of issues, obviously, have been raised. My intent here is to address what we view as the big ticket item, which is whether or not full risk organizations have standing to bring a private cause of action under 1395YB3A. Okay. And then subsequent to the extent that the court has questions to venture into some of the pleading arguments that have been raised and address the assignments, although it's our position that they've been addressed by a number of other cases that have been before this court most recently. On its face, this case is about who may sue under the MSP private cause of action. But a further look makes clear that it is, in fact, about the functional parity between the Medicare Advantage Program and Medicare, which was recognized by this court in Western Heritage and which was extensively analyzed by the Third Circuit in Ria Vandia. The standing test announced in the Ace American case is, in fact, an unsupported and arbitrary standing bar. Before you get to that, is this really a standing issue in terms of what Article 3 requires or a question of who can sue under a statute, which is a related and overlapping concept but not always the very same one? That's right, Your Honor. In a sense, the case presents both, as is often the case in questions of statutory interpretation. It's our position, as raised in the briefing, that Article 3 is the centerpiece here, and that's exactly what was analyzed in the MSP private cause of action. In fact, it places no further requirements on who may bring a private cause of action in the event of a primary plan that is to be reimbursed. What you're saying is that the key here is whether or not the plaintiff was injured under Article 3, the standard constitutional standing analysis. That would be the so-called private right of action. The other side is saying anybody who ever touches any of these things has a right. No, these are people who can point to some injury if they can't sue, based upon the mechanisms that are in place at the time, the contractual obligations, and so forth. That's why, even though they were purely statutory with the MAOs, they also apply to the contractual. Everything else is the same. That's exactly right. What you're saying, I guess, is that the capitation program, which applies to the MAOs, which is designed to reduce costs and force the person who is the S&E to try and obtain recovery, but also keep the medical costs down in order to realize some profits by virtue of their business plan, applies to subcontractors just in the same way it does to MAOs. That's correct, Your Honor. The only nuance that I would add is that I think subcontractor doesn't quite capture the true nature of the assigners that are at issue here. Just the way you were describing, the Medicare Advantage plan takes on the risk from the government. That's the nature of the program. In this instance, what we have alleged is that, in fact, the assigners at issue here, Hygiea, HCAS, and Veramed IPA, have taken that risk on themselves from the health plan. That's provided for under the statute. In fact, it's incentivized, and it's an essential piece of this program in order for it to function as the way it was intended. You're exactly right. The only thing is... The 422.2, which talks about these downstream entities, and 422.504, which deals with how they should operate and what the requirements are, incorporate them within the system as a regulatory matter, if not a statutory matter. That's correct, Your Honor. I would add that 1395W-25D also provides for precisely the type of entities that are at issue here. That is to say, provider-owned and run entities that enter into arrangements to take on the substantial risk and provide... Looking at the overall picture here of the cost savings that are supposed to be inuring to the benefit of the taxpayers, if you will, you're dealing with these various capitation limitations which are set forth for the MAO and then for the downstream entities. They work together in that sense. Each one is, as I understand it, but correct me if I'm wrong, each one is a sort of a capitation arrangement that accomplishes those competitive objectives. Is that right? There's a capitation payment. There's a capitation arrangement wherein certainly these full-risk organizations accept a portion in exchange for... But there's also the risk aspect of it, which it appears to me wasn't appreciated by the local. They have to either pay the beneficiary or reimburse somebody upstream who's already paid the benefit. Exactly. So it's more than simply a payment for services that comes from the Medicare plan. It's a government capitation. It's identical to what was at issue in Western Heritage. So that's one aspect of trying to control costs during using this scheme. The other is to try and get the primaries to pay. That's correct. The primaries are not paying primary. They're waiting and the secondaries make the payment and then the primaries are not stepping up after those payments are made to reimburse. They are waiting and it's obviously from an economics perspective to their advantage to do that, put it off as long as possible and have the lawsuits come in in as limited a way as possible. That's why what your client is doing is problematic from their perspective because it aggregates these claims and goes after the primary reimbursements en masse. That's correct, Your Honor. It makes it feasible and it makes economic sense to be able to pursue them in this manner. So without the primaries paying, just so I'm trying to understand this from an economics perspective, without the primaries paying, the costs then are shifted to the taxpayers and through the Medicare system, the MAO system and so forth. If the primaries come in and pay, then the taxpayers are relieved of this risk to the extent of the primaries' obligations. The taxpayers in the way the system is structured, obviously as described in detail in the Third Circuit's Inria Vandia opinion, it works on a system of bids and risk factors and that's exactly so Your Honor has hit it right on the head. When this money is taken back into the system, the utilization goes down. As a result, those funds are conserved and the bids can be more competitive. So you have two different results for the Medicare beneficiary. It's both that the cost goes down to the Medicare system, but at the same time, to the extent that the bid remains the same, at that point, the Medicare Advantage plan and the full risk organizations that have been described in this action are able to compete for these Medicare enrollees by providing additional benefits above and beyond what original Medicare is able to which was the other purpose of creating this type of competitive system. Now, what is your response to the arguments of the other side that they really are not disputing the fact that they owe this money? And presumably, if they're not disputing it, at some point they intend to pay it. I would like to see it, Your Honor. At this point, I think that a survey of dockets around the country would suggest that the private no fault and liability insurance industry is willing to read as many requirements into this very simple cause of action as possible to avoid paying for as long as possible. As we have highlighted here, there is really no fundamental dispute as to whether or not we can use the auto owners case as an example. There's no dispute that a settlement was entered into. There's no dispute that it appears that auto owners made no effort as was described as required as described in Western Heritage to identify whether or not the MAO was out there. Is there a statutory requirement or is this just a matter of some other norm about the notice requirement to the insurance company? They've obviously admitted their primary status in whenever they settle. That's clear. But what about when they don't settle? When they don't settle? So we have two, these cases present two different scenarios for demonstrated responsibility. Where there is an instance where a settlement hasn't been entered into, then we have an instance where responsibility in that context has not yet been demonstrated. The plan, the primary payer is not yet a primary plan for purpose of the act. In the alternative, we have no fault classes that have been asserted here. The no fault classes proceed on the basis of no fault contract contractual no fault obligations which were at issue and discussed in this in the 11th circuit's all state opinion. The contractual liability there, the demonstration of responsibility is accomplished by virtue of the no fault contract which requires the primary plan to reimburse these secondary Medicare payments. So if there is no settlement, that is a defense that certainly could be raised. It speaks to demonstrated responsibility. But that isn't what's been alleged here. Clearly the settlements at issue with respect to the two settlement claims have been clearly enunciated in the pleadings. Is the class you're representing here or hope to represent one that all of those are settled claims or are they both? The, in fact, these cases present both. Two separate subclasses and that's identify the auto owner's complaint is a good example of that. Yes, and we have split our exemplar claims, these examples that we provided to identify or to substantiate our standing or evidence our standing to proceed in these cases by separating them into those two categories. In this world, is the concept of an assignment different than it is in any other area of law? In other words, that if you have a breach of contract action or a contractual right that you can assign for consideration to someone else, is there anything about this area of law that makes assignments different? No, Your Honor. Or are general principles of law applicable here? General principles of law are applicable and that was also detailed in the 11th circuit's opinion dealing with whether or not there might be some sort of governmental bar to whether or not these claims could be assigned in this court. Clearly, this is a... Your argument is that even, and I'm thinking of Liberty Mutual now, even when the SNR assigns and there is a requirement that there be permission from the SNR for a future assignment, that an assignment of rights can still take place when there is no approval. That's correct, Your Honor. Based upon a good body of case law, which was cited by my colleagues from representing MSPA Claims 1 LLC, as far as I remember, and they might be able to speak to it more directly because it doesn't necessarily present itself in... It would vary. It might be different if in that particular agreement, there was a specific reference to rights being prohibited. That's correct, but that was not the case. Well, in light of the, if there are further questions, I'll reserve the balance of my time. Great. Thank you. You've got it. Thank you very much. Ms. Copperthwaite. May it please the court, Nancy Copperthwaite on behalf of Appley Ace American Insurance. Can I ask you one question? Yes. That I would like one of you on that side of the case to address at one point, and that is whether or not any dismissals that were purely for lack of Article III standing should have been without prejudice. Those sorts of dismissals may have preclusive effect that's between the parties in later litigation, but they generally don't bar the party from, for example, adding allegations that should have been added to show standing. I don't need you to answer it, but I need someone to talk about whether or not the dismissals that were Article III based only should have been without prejudice. I was just about to say that as in our brief, Ace is deferring to travelers on that issue, which was the sole issue raised in the traveler's appeal, and Mr. Friedman will be addressing the dismissal with prejudice for all the cases. Thank you. Okay. This Ace case is a bit of a unicorn case, if you will. It is very rare that you have a district court hearing in which the judge provides a roadmap, much less three hearings totaling 12 hours where the judge repeatedly gave the plaintiff instructions on what should be pled in the complaint, and yet the plaintiff failed to do so. We're on the plaintiff's fourth complaint, and yet the plaintiff has still failed to plead the allegations regarding the MAO, which is not named in the complaint, and the relationship between the MAO and the assigner here. On that basis alone, the trial court correctly dismissed this action. The assigner here further to address some of Judge Walker's questions did not have, was not an MAO. That's admitted, and did not have the same standing that an MAO would to show damage and to assert a claim under Western Heritage. Why is that? It's a practical matter. Looking at the economics that I discussed. Because, Your Honor, for a very good economical reason, because the MAO still retains the right to assert that claim. As discussed at length in the amicus brief. Well, there's not going to be double recovery, right? Your Honor, if this court were to allow an assignment, excuse me, an assignor who is not the MAO to assert a claim, and the MAO still has the claim under the statute, under the regulation, then, yes, we are facing exactly that situation, which the amicus brief, as I said, goes into. In the face of the arrangements, all of these arrangements that are set up, so that there would be a, if there was a recovery by, to the extent that the MAO was entitled to some kind of recovery, they would get it from the downstream entity. Not after the downstream entity gets their reimbursement. Well, a few things. First of all, Your Honor, there's no allegation about that. That's what I want to stress, too, about the ACE, is that the judge said to plaintiff's counsel, I have lots of paper, I don't have lots of facts. Here are the facts that I need. We don't have anything about that. For example, there could be situations where they have the subcontracts, the MAO and management service organization contracts, perhaps prohibit the management service organization from proceeding. Where they prohibit them from asserting claims without the MAO's consent. Furthermore, if you look at the hearing transcripts before Judge Seitz, ACE came into that hearing with a claim file on one of these claims. And Judge Seitz ordered a recess or a lunch break or something like that and said, I want you to share this claim file and go over it with opposing counsel, which they did. That reflected, one, ACE fulfilled its obligation to report to Medicare. It entered into a settlement. It paid. So the allegation that there's never been a payment here, that's just factually incorrect. Was there enough of a payment? I mean, Medicare is a different thing. Medicare wasn't involved in the... Well, no, Your Honor. The obligation under the statute is that the insurer reports to Medicare. That's a public... A public... Do you think that it extinguishes the claim at that point? No, no, no, no. Just so that then it becomes public knowledge that in fact, there has been an accident. There has been an acceptance of liability. And ACE actually entered into a settlement here. So there was a settlement and there was money paid. To what extent was, and we'll use her as an example because she's the one that you mentioned. To what extent was Judge Seitz asking the plaintiffs to prove their case through their complaint as opposed to make out a plausible claim a la Twombly and Iqbal? Your Honor, I think definitely the latter. As I said, she said, can you tell me who the MAO is? Can you tell me what the relationship is? Can you give me why you are suing ACE? What was the action that led to that? What's the alleged money? Can you tell me what money you paid? Meaning the assigner. And in fact, the assigner, all the assigner said is we were charged. That was a charge under their private subcontract. That wasn't a primary payment. I mean, I'm sorry, secondary payment for which they're trying to recover from the primary payer. The MAO still, under the statute says the MAO has responsibility. I want to understand this a little more. The MAO then presumably made the payment. Correct, correct. And then charged back against the downstream entity. Perhaps. We don't know the terms of the contract, Your Honor. The contract is, there's sort of a wall, if you will. There's the public information, which is Medicare, MAOs, the settlement that ACE notified Medicare about, that's all public. Then there's this wall. And then the MAO can have a contract with an MSO, which could have another contract, which could have another contract. There could be multiple layers of subcontracts. And that's not known to us. There's no way that an insurance company can report or give information to somebody on the other side of that wall. Our only obligation is to notify Medicare. What about the regulation 422.504, which requires certain reportings and certain contracts? Contracts have to be approved by Medicare. All these contracts have to be approved with the subs or with the downstream entities, if you want to call them that. And the various terms have to be set forth. And certain terms have to be set forth. So isn't there a record kept by Medicare of these contracts, all these other contracts? No, Your Honor. They have to be approved. Well, I shouldn't say. I don't know the answer to that. But they are not publicly ascertainable, whether they are kept. Not on a website. Correct. Correct. Whereas the MAOs are all identified. So you can look them up. My time is at an end. So if there are any other questions. Thank you very much. Okay. I'll defer to my colleagues. Ms. McAllister. Good morning, Your Honor. To please the Court, Laurie McAllister on behalf of Auto Owners, Owners Insurance Company, and Southern Owners Insurance Company. As you probably observed, we also have a unique record in that there were originally four cases that were filed. And eventually at the end, they were all consolidated into one. As a result of that, we were on the 14th complaint by the time we got to the motion to dismiss. In our case, Judge Seitz made an appropriate decision. There were two alleged sources of which plaintiffs alleged that they could sue. The first one related to an alleged MAO, which was Health First Administrative Services. I thought Judge Williams ultimately had the auto owners case. Am I mistaken about that? I've got a chart where I tried to break everything up. I believe he had the Liberty case. Judge Seitz had all of our cases. Okay. All right. Thank you. No problem. What is it? Is that HFAP that you're talking about now? HFAP, yes. H-F-A-P? It's Health First Administrative Services. Health First Administrative Services. And they turned out to not be an MAO. And we learned that because Plano's filed an affidavit for Mr. Keeler that told us that. And as a result of that, in this appeal, they have said, we're not going to contest any of the Health First Administrative Services dismissals. And the only thing we're going to contest is whether it was with or without prejudice, which is obviously the issue Mr. Friedman is going to address with you next. Southern Owners Insurance Company- The MAO here was Health First Health Plans. Is that right? Supposedly, yes. Yeah. Okay. But they were not named in the complaint, nor was there any evidence that they had given an assignment to the entity that they did name and call an MAO. The ruling was based in part on a conclusion or a finding that HFAP, I think I have the acronym right, had a contract for services. Administrative Services. But that was not an assignment of rights. That's correct, Your Honor. From an MAO. The only contract they had pertained to administrative services and management services. They did not have a contract that would have provided them, which would have required them to pay for health care. And that's why they've dropped it. So in other words, not an assignment. Not an assignment. Who was the full risk entity downstream, if any? We have no idea. It wasn't alleged in our complaint. And that's why they're dropping it on appeal. The other entity that formed a basis of a claim against the auto owners group was VirMed. They pled that VirMed was, in fact, the provider. And then we demonstrated through exhibits GNI that they attached to their complaint that VirMed, in fact, was not the provider. And those exhibits demonstrated who was the provider and it wasn't the same entity. So VirMed has no MAO assignment. It is not alleged to have done anything other than supposedly paid for medical care. But when you looked at their exhibits, in fact, there was no payment for medical care that was made by them on their own records they submitted to the court. So my three minutes is over unless the court has any questions for me. Was on the VirMed, was that determination at the district court made factual in nature or facial in nature? It was factual based on the documents the plaintiffs themselves submitted. Okay. Thank you so much. You may please the court. My name is Bryce Friedman. My firm is Simpson Thatcher. My client is Travelers. And I'd like to address the question that Judge Jordan asked about the with prejudice dismissals. And in the course of doing so, respectfully disagree with some of the premises of Judge Walker's questions about the economics and the way this works. The Travelers case, the decision was issued by Judge Williams. And the issue on the Travelers' appeal is whether the district court order should be affirmed insofar as it was with prejudice. The plaintiff and appellant has not appealed the merits of that decision. So our first argument, of course, therefore, is that pursuant to at least Fifth Circuit precedent, I don't think this court has addressed the issue, the just with prejudice, without prejudice issue is waived. As for the actual decision. I don't understand what that means. So in the Zamudio case, 129 Federal Appendix 79, you can't appeal just a with prejudice or of the dispute. So why does that make sense? That makes sense because you would have to show that the dismissal was not appropriately without prejudice. And to do so, you have to address the merits of the case. And if you accept the dismissal, you're still aggrieved by an order. If a dismissal was for lack of improper venue or lack of proper venue, right? And you don't disagree with the ultimate ruling of the district court that venue was improper, but the district court dismisses with prejudice. Why shouldn't you be able to appeal the with prejudice part since you're aggrieved by it and then be able to file in a place where venue is properly laid? I could see your perspective, but that is not this particular case. In this case, the dismissal. It's pretty close. No, I don't think so. Because in this case, it was for statutory standing. And in the case of statutory standing, there is no question that that is a merits 12B6 with prejudice type dismissal. And the fact that the orders here, to the extent I can remember them, because there's so much paper in this case, some of them, I don't want to say all, but some of them sort of blend the statutory standing with the Article III standing so that it's unclear at times what sort of standing is being referred to. Well, you don't know whether or not, like you said, it's a statutory dismissal because there's really no cause of action through lack of statutory standing. Or whether it's Article III standing because you haven't met one of the three prongs dictated by the Supreme Court. Well, two points on that. First of all, I think it's pretty clear when Judge Williams, for example, says that plaintiff has failed to allege that its original assigner, HFAP, has standing under section 1395YB3A. She says that multiple times. And Judge cites, and that's on page 9. And on the other orders in the case, pages 8 in the auto owners and pages 8 in the ace owners say the same exact thing. And I think it is erroneous to assume that statutory standing in this case is coextensive with Article III standing because it is not. It is not. None of these district courts mentioned Article III in their orders? They absolutely did mention Article III. That's my point. Why would you mention Article III in the context of discussing statutory standing if Article III isn't involved in some way? Because I think that one of the arguments that the plaintiffs made below was that the standing under the statute was coextensive with Article III. And that is not the case. For this court to suggest that would be an error because it is not coextensive. And to rule that the FROs, in what your honors are being asked to rule, have standing would be inconsistent with this court's decision in Harris. And this court's decision in the Blue Cross case, Brooks. Because what the court did in those cases which present very analogous facts to this case is said, what is the extent of the statutory standing under the MSP Act? And let me explain that for one second. What they are arguing here is that their FROs, which Judge Walker is correct, are referred to generically in the regulations that are possibly existing, but not in any of the complaints that are before the court, argue that those automatically have statutory standing. And that is incorrect. And here is why. If you look at page 42 of their brief, which is the place where they describe what an FRO is, they explain that the MAO... We have a lot of acronyms here. FRO is... That is the word that the appellants use for subcontractors. They call it Full Risk Organization. Full Risk Organization. Yes, exactly. So at page 42 of the brief is the only explanation we have of what that is, because it doesn't appear anywhere in any of the complaints. And what they say there is that the MAO, the Medicare Advantage Organization, which is the government entity that does all the economic things that Judge Walker was asking about, was paid back 100% in full. Let me say that again. The MAO, which is essentially the government here, was paid back 100% in full. And what they are is essentially an insurer of the MAO. And in the Harris case, this court said when you have two insurers, when the government has been paid back, the conditional payment is 100% paid, the government has no claim, and you have one insurer says to the other insurer, I paid it back 100%, so you, other insurer, need to cover the other piece of it? You need to put in your path? This court in Harris said no statutory standing. And that makes 100% sense. Having the downstream entities, all of whom have some economic relation involved in providing Medicare benefits to Medicare beneficiaries, fight among themselves how to split up that money, is outside the zone of interest of the statute. Why is that? Because then if the service that cleans the doctor's office, or the person who takes out the trash, who is somehow shorted money, and they attribute it to a failure of a primary payer to make a conditional payment, then you have all those fights come within the construct of the act? It's not the case. But those people aren't making any payments, those people you described. But what's the difference between being out money and making a payment? The FROs, as described by the appellants, are just insurance companies. They don't use that word, but if you read the regulations that Judge Walker cited, that's what they are. They take the financial risk of providing the care. The MAO says, I'm going to go buy some insurance from a FRO, a full risk organization. The full risk organization insures the MAO, so the MAO is out money, and now you have two insurance companies fighting over who is responsible for which part. So I will say, also, just for the record, that as primary payers, my client is interested in making sure that it complies with its obligations under the act. And if there's another insurance company out there that says to my client, perhaps you owe us some money because you are a primary payer, my client is going to try to make good on that. But what we can have here is a bunch of secret arrangements, which are not available to anybody, and they are not available to anybody. It's the form of the contract that is approved by Medicare, not every contract. Some secret arrangements in which money changes hands over there, and then all of a sudden you claim you have a double damages act against my client. That's not how the zone of interest works under the statutory zone. I don't have my cell phone, so I can't look up the federal regulation as to whether it's the substance of the contract or just the form. But I was under the understanding that the contracts themselves were, each contract was approved. Maybe we're saying the same thing, but if it's a contract with Joe's FRO, I don't know that that particular contract is approved as opposed to, here's the contract we enter with all our FROs. These are the words that are in it. But if it's one and the same, it doesn't matter. In other words, if it's a form contract that's approved, that form contract is used all the time, then it doesn't really matter. You've got what the contract says. Yeah, but just plug in the names. But I don't accept the premise, and I think it would be an incorrect premise for the court to say, because a regulation mentions approval of a contract, that somehow that provides somebody statutory standing. No, that's a different issue. But that's what I'm focused on, because that's their argument. Their argument is because the regulations mention us, and they contemplate somehow we are involved in the healthcare system, the Medicare system, therefore we have standing. That's not what this court said in Brooks. No, no, it's not somehow. Yeah. They're saying that they have risk. You're saying that that's the kind of risk that is not contemplated here. Yeah. But they are saying it is the same risk. Well, but I would request the court not lose track of the statutory language here. The case that my colleagues cite, the appellant cite, is the Alabama Tom Bigby case from the 11th Circuit. That's the case they cite to support their standing. That's a case under the Endangered Species Act, in which the statute says any person can bring a suit. That's not what our statute said. Our statute says there's established a private cause of action in the case of a primary plan which fails to provide for primary payment. The question is then, where there is no specification of who can sue, but there is a right to sue, then what is a reasonable way of interpreting that? Other than everybody can sue. And plainly, that's not the case. And that's this court's job under Lexmark. And I would say two things about that. So we know already there are cases that out there that say the beneficiary can sue, the provider can sue, and in this circuit, and I think third, the MAOs can sue. And I thought Judge Seitz said that's the limit. But those cases don't set limits. Those cases just say those people can sue. They don't address others. They don't specify who can't sue. And so that's the issue before us, whether somebody else and these FROs or downstream entities can sue. And so if we decide that the downstream entities can sue, then we're thrown back, it seems to me, on the particulars of each case and whether there was proper pleading and all of that. Well, I think Lexmark requires a statutory analysis of statutory standing before you just revert to Article III. There's nothing in the provision in question that specifies statutory standing. Well, I think that what Lexmark would tell you is you have to not only read the statutory provision, but you have to read all the act and all the surrounding purpose to gather what used to be called whether to apply what used to be called prudential standing around whether somebody should have standing here. Two points on that. One is I don't think there's enough in the complaint for your honors to rule that FROs have standing. I think you need to look at the complaints before you because any decision as to who or who shouldn't have standing has got to be based on what is in those complaints. But if you take at face value what's in their brief, I will tell you that they don't fall within the zone of interest. There's no congressional law or agency act that puts responsibility on them to take care of anybody, to make any payment, to do anything specific, which contrasts dramatically with MAOs. Why isn't reading that entire provision of 1395, I think it is, or whatever it is, lay out a system in which there's supposed to be cost savings by various mechanisms and that that is the interest. And look at whether this is in that zone. Well, it does. But maybe it's too broad. I mean, I don't know. You may argue that, well, that's too amorphous. I just don't know. Well, I think that is amorphous and that would be part of the problem. But more importantly, I think the point here is the MAO, this court has decided, is clearly in the zone of interest. That's what was decided in Western Heritage. And the rationale for that decision is very clear and simple and, frankly, makes some sense, which is that an MAO makes a conditional payment. That's what this is about. It's conditional payments. And where the MAO is paid back. And here, under the facts posited by the brief, the MAO is paid back. The government system has worked. This is now a bunch of separate arrangements that have nothing to do with what that primary Medicare secondary payer act is about and granting them standing for double damages under the act. You would think that it would be more specific if it were going to go more broadly. On the final point, which is whether mine should be without prejudice. Well, we've taken you way over your time. You have. Thank you for your indulgence. Thank you very much, Mr. Friedman. Mr. Russo. If you may please the court. My name is Anthony Russo. I represent Liberty Mutual Fire Insurance Company. The issue in the Liberty portion of this proceeding is smaller and it is controlled, I would say, by two cases. IDS Property and Casualty Insurance Company versus MSPA Claims 1 LLC, who is your appellant here today. And the tenant case, or a part of the tenant case. This is a smaller case. This is one, Judge Walker, where we are looking at the specific nature of the agreements and whether they are valid. And in this court, Judge Williams ruled that they were not valid and that there was not a valid assignment at the time of the complaint. And therefore, dismissal was appropriate. And two months after Judge Williams issued her order, the Third District Court of Appeal, here in the IDS versus MSPA Claims 1, on the same LaLaye agreement, with the same plaintiff said that that agreement was invalid to convey an interest sufficient for MSPA Claims 1 to proceed with its class action HIP claim. Is that as a result of the receivership? That is correct, Your Honor. The receiver . . . The receiver . . . Or was it also non-approval? And there were two bases. One, I believe there were two bases in our argument. There were two bases in Judge Williams' opinion that we're asking to affirm. And I believe that the IDS case from the Third District Court of Appeal mentioned both of those. Certainly, if you go to the public record of that case, which are the briefs that are available in Westlaw, of the two parties argued vigorously. They got into the weeds with the nuts and bolts of this LaLaye contract. And the Third District Court of Appeal adjudicated the contract issue that is before the court here. Now, that IDS case wasn't identified in the initial brief of my opponent. We raised it, Liberty did. In its answer brief, there was only, at that time, there was not a Westlaw cite. It is 263 Southern 3rd 122. It was not addressed in the reply brief of my opponent. And I didn't hear anything today yet. So the first time in a year of litigation that Liberty will have the opportunity to hear what MSPA claims one thinks about the IDS case is when my opponent gets up here to rebut what I'm saying right now. That LaLaye agreement was not valid under, as we argued, as Judge Williams accepted, and as the Third District Court of Appeal, as a matter of state contract law accepted, the LaLaye agreement was not made with the required approval of Florida Healthcare Plus, which was the Medicare Advantage organization. Given the peculiarities of your case, was that a dismissal on Article III grounds or statutory standing grounds? The judge identified it as Article III and she mentioned and discussed why it was with prejudice in the last page of her opinion. And we have defended that. And I have deferred much of that argument to my colleague, Mr. Bryce, for travelers. But this was their fourth complaint, maybe their fifth, depending on how you look at the history of the case. That shouldn't matter. I mean, if you're dealing with merits issues, that does matter a lot, right? Because you only get so many bites at the proverbial apple. But if you're dealing with something that is subject matter jurisdiction-based and doesn't address the merits, those dismissals are generally without prejudice. They have preclusive effect between the parties in subsequent litigation, but it doesn't prevent a party from filing a complaint that satisfies subject matter jurisdiction. And I understand Your Honor's concern. There was a facial challenge. There was a factual challenge. And this dismissal was granted on both. And I believe- That may make it harder for them to ever sue again, if that's the case. But it doesn't necessarily mean, at least as I understand the doctrine, that it should be with prejudice that they can never, ever try again. But maybe I'm wrong. Alternate grounds that we identified in our answer brief were the futility doctrine. And the utter futility here is obvious by looking at the IDS versus MSPA claims. One decision which negated the ability of a class action and a PIP claim. And for all those reasons that we ask the court to affirm Judge Williams' decision. Thank you so much. Seven minutes is not enough, but you can try. Maybe you'll let me go a little bit longer once we get into it. Let me begin by responding to Mr. Friedman point because he has raised the central fallacy that runs through the Apalis briefs. And that is that the theory that the Apalis advanced regarding subcontractors divides the Medicare Advantage program up into component parts. Ignores the risk and seeks to, in essence, eliminate the cause of action. It's very clear what has been alleged here is that the assigners at issue bore the full risk. They made the payments. They entered into a contract, managed the care, and have done everything with respect to these particular enrollees. They are the payer, and they are the provider. That's what Veramet is. That's what Hygieia and HCAS are. What the Apalis argument fails to recognize is that the injury to the Medicare Advantage program, that the private cause of action is intended to remedy, remains as a result of the failure of a primary plan. I'll add for the court, the appellants here are in no way a primary plan. And this brings it squarely outside of Brooks, which concerned a dispute between two primary plans outside of the Medicare industry. This is about a primary plan's failure to reimburse and the interests that have been affected as a result of that failure to reimburse. And those interests have already been discussed at length in Western Heritage. There, the court looked at the precise risk that was taken on by the Medicare Advantage organization and the injury that was suffered by the Medicare Advantage plan as a result of the failure to reimburse. That is the precise risk, which is borne by the full risk organizations here. And it is the precise injury suffered by the full risk organization here. The injury remains within the Medicare Advantage program and has not been remedied. The simple fact that the reimbursement has been made to the Medicare Advantage plan by the full risk organization underscores the point that the injury, the injury in fact, and the right to come before this court under 1395YB3A under the article three standing test rests with the full risk organization, the risk bearing entity, which is contemplated throughout the statute as has been discussed thus far. And when we looked at- One of the contentions on the other side and one of the rationales that one of the district courts provided was that you had just had pleading deficiencies because assuming that there was general standing statutory in article three to proceed, that there wasn't enough specificity or information in the complaint for the court to be able to figure out whether or not you were properly there or not. Do you want to address those points? Sure, Your Honor. Effectively, your earlier point, I think, is it underscores the appellant's position here. What happened is that the approach that's been taken by the district courts is one that requires proof beyond rule nine at the pleading stage. What do we actually have in the complaints that are expressed that are before this court in auto owners and particularly in ACE? It specifies clearly that Hygeia made payments. It specifies clearly that HCAS made payments for the particular items in service. As MAOs. It says that they made the payments and it describes the system within which they work. It doesn't- It may require also that FROs qualify as possible plaintiffs under the private provision, private act provision. But in any event, you're saying they made payments. Correct. They made the payments. And the facts regarding these particular entities were raised in detail to the court. And they were responded upon in the auto owners complaint where full risk organizations are described in detail and Veramed IPA's relationship to Optimum, a Medicare Advantage plan. Insurance companies. He says they're just insurance companies and that Harris controls. It seems disingenuous at this stage to call them just insurance companies. These are not just insurance companies. This is Medicare. This is Medicare. This is privatized Medicare, which is respected and codified under Medicare Part C. This is the system. And ultimately, the decisions in the lower court proceed based upon a misunderstanding of the system and the risk that is concentrated in it. How much do you have to put in a complaint of this type to satisfy Rule 12, both B1 and B6, that you are the right person to sue for the request, the relief that's requested? What do you have to say? How little can you say? The elements themselves are laid out in Western Heritage. It requires a primary. It requires status as a primary plan, which we have plainly alleged. It requires a failure to reimburse, which is plainly alleged. And it requires damages, which are plainly alleged. Nothing else? By virtue of the payments. Those are the elements of the cause of action. That's what entitles a party to summary judgment as identified in Western Heritage. With respect to 12B1, again, we look to Article 3. And so an injury need have been identified. And it need be fairly traceable to the acts of the defendant. The injuries that are identified and detailed, particularly in the auto owner's complaint with Veramed, they flow foreseeably and directly from the failure to reimburse by the primary plan. What do you have to allege, if anything, with regards to assignments in cases where assignments are at issue? We have to allege the fundamental terms of the assignment, which are detailed in each of these complaints. The assignments are attached with the travelers that... These are the assignments to your client, correct? Correct. But not necessarily the prior assignments, right? How much do you have to show for the chain, in other words, at least at the 12B stage? At the 12B stage, I think it requires, at minimum, an explication of the complete chain from the party that suffered the injury to the plaintiff in the action. The appellees have raised that MSP Recovery Claim Series LLC is outside of the chain and doesn't necessarily have standing to sue, but other courts that have looked at the same allegations have noted the affirmative allegations regarding MSP Recovery Claim Series LLC that are identified in each of these complaints, which plainly state that the limited liability agreements that are in place between the series and its designated series provide for standing. That's... If we look back to the... I'm not sure I understand your answer as far as... Okay. ...prior assignments are concerned. And, you know, presumably you don't go into them in detail or have them in your complaint as exhibits because you don't have them yet, I guess. But I'm talking about the assignments from an MAO to a FRO to another FRO, et cetera, and then eventually to you. You have that last one. That's... There are two separate assignment issues that have been raised by the appellees. One regarding the actual chain of assignments that entitles the plaintiff to bring its case and the other that posits that a full-risk organization would require an assignment from the Medicare Advantage Plan to be able to pursue this case. We have alleged that a full-risk contract was entered into. And that full-risk contract provides the certainty required to satisfy Article III with respect to the injury that has been suffered here. No further assignment is necessary. The injury is singular and particularized to the plaintiff, to the assigner in the action, which is the full-risk organization, the entity that took on the precise risk that was shifted from original Medicare over to the Medicare Advantage Plan. Well, that gets you maybe over the constitutional hurdle, the Article III constitutional question. But then you also have the other prudential question about whether or not you can state a claim here, at least upon allegations of some sort of assignments, but the assignments are not specified. So the requisite assignments are specified. And that's what the prudential standing question is one that concerns the statutory standing of the full-risk organization to bring the suit. We have two separate sets of claims here. The one regarding Health First Administrative Plans, we posit that there was, although a perceived error in the assignment, it was always the intent for the actual health plan to assign those claims, which was Health First Health Plans, Inc. And that was laid out in the affidavit of Michael Keeler, which was reviewed by the Seventh Circuit and also in the lower court in order of honors. Separately is whether or not these full-risk organizations are embraced within the purview of parties that can bring a claim under 1395YB3A and thus had a claim to assign here. Based upon the statutory structure that Your Honor has been detailing throughout this proceeding, there is plainly statutory standing. There is plainly statutory standing. And I would add for you... It's statutory standing for the MAOs. There's perhaps regulatory standing for the others? They fall squarely within the statutory framework. They're contemplated and incentivized. That's it. I think we can look at it this way. In the back and forth with Mr. Freeman, you described the spectrum of plaintiffs that have been recognized to be able to... as having statutory standing to proceed under 1395YB3. It begins with the Medicare Advantage Plan, the actual party that's making the payment, the conditional. And its payments have been recognized as conditional. It proceeds down to the provider and it goes further to a Medicare beneficiary that suffers an injury in fact and is thus able to bring a claim. We fall squarely within this recognized spectrum. We're not asking anyone to venture outside of it. We're not creating anything novel. Whereas this party serves by virtue of the statutory structure that's been put in place, the full risk organization serves as both payer and provider. And it makes no sense to carve them out and to create a series of payments that effectively would not be recoverable because ultimately the Medicare Advantage Organization has been reimbursed. However, the Medicare Advantage Program has still continued to suffer the injury recognized under 1395YB3A, which is concentrated with the full risk organization. So in effect, what the Applees are advancing would be a tacit reversal of Western heritage by carving out a whole subset of payments that would no longer be recoverable. And we would ask the court not to do so. All right, Mr. Zincon. Thank you very much. It's been very helpful on all sides. And the only thing we can promise is you won't have a decision before the end of the year. So we're in recess.